UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

VERNA MAE HEAROD,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )   Case No. 4:10CV751 RWS/FRB
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
          Defendant.                 )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is before the Court on plaintiff Verna M.
Hearod's appeal of an adverse ruling of the Social Security
Administration.   All pretrial matters were referred to the
undersigned United States Magistrate Judge for appropriate
disposition pursuant to 28 U.S.C. § 636(b).

**I.  Procedural History**

        On July 23, 2007, plaintiff Verna M. Hearod ("plaintiff")
filed an application for Disability Insurance Benefits pursuant to
Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq.
(also "Act") alleging disability as of July 1, 2006.
(Administrative Transcript ("Tr.") 10, 84-91).  The Administrative
Law Judge (also "ALJ") noted, and plaintiff does not contest, that
plaintiff's last date insured under Title II was September 30,
2006.[1]  (Tr. 134).

───────────────

[1]To be eligible for disability benefits under Title II, plaintiff must
show that she became disabled prior to the expiration of her insured status.
See 20 C.F.R. § 404.130; see also Davidson v. Astrue, 501 F.3d 987, 989 (8th

Plaintiff's claim was initially denied, (Tr. 46-47), and she requested a hearing before an ALJ, which was held on July 16, 2009 before ALJ F. Terrell Eckert, Jr. (Tr. 18-44, 77). During the hearing, plaintiff testified and was represented by counsel. (Tr. 18-44). On August 25, 2009, ALJ Eckert issued a decision denying plaintiff's claim. (Tr. 7-17).

Subsequently, plaintiff sought review from defendant agency's Appeals Council (Tr. 4) which, on February 24, 2010, denied plaintiff's request for review. (Tr. 1-3). ALJ Eckert's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

During plaintiff's administrative hearing, she acknowledged that she was alleging disability as a result of arthritis, reduced strength in her hands, cataracts, weakness in both ankles, chronic pain in her right hand, and memory loss. (Tr. 20). Plaintiff testified that she was 60 years of age, and lived in a house with her husband, brother, and two adult children. (Tr. 23-24). She completed the tenth grade, and was in special education classes in seventh and eighth grade. (Tr. 24). Plaintiff attended cosmetology school, but did not complete her program. (Tr. 24-25). She testified that she was able to read, write, and perform basic math such as addition, subtraction,

---

Cir. 2007). Therefore, as the Commissioner states, and as plaintiff does not contest, the relevant time period in this case is plaintiff's alleged onset date, July 1, 2006, through her last date insured, September 30, 2006.

multiplication, and division. (Tr. 25). She was five feet, four inches tall, and weighed 177 pounds, which represented an approximate 20 pound weight gain. (<u>Id.</u>)

Plaintiff testified that, from 1998 to 2000, she worked at a factory on an assembly line, stuffing envelopes. (Tr. 26). She described other former employment as a hotel room maid, a worker in the laundry at a nursing home, a packing and processing worker, and a home health aide. (Tr. 26-27).

Plaintiff testified that she had filed previous applications for benefits, and that she had returned to work after being denied. (Tr. 29).

Plaintiff testified that Dr. Arthur Gale prescribed a neck collar for her in 2005, and noted that she had lumbar radiculitis and bilateral carpal tunnel syndrome. (Tr. 30). She testified that she could not sleep in the neck collar or wear it while driving. (<u>Id.</u>) She stated that she was seeing Dr. Gale because she "woke up one morning and I couldn't get out the bed. [<u>sic</u>] And when I got ready to get out I fell getting out the bed. [<u>sic</u>] Then I realized my leg was swollen real bad. And then I had pain in my back so I called them and I told them about it. They told me to come in. And when I came in Dr. Gale treated me but he also send me [<u>sic</u>] over to the DePaul Hospital for an MRI." (Tr. 31). Plaintiff testified that she took pills Dr. Gale prescribed, but changed to Tylenol when she could no longer afford them. (<u>Id.</u>)

Plaintiff described her neck condition as "just like you got a crook. Like you have a little crook in your neck." (<u>Id.</u>)

Plaintiff testified that she could not sit still for a long time and could not raise her left hand over her head, and stated that she had pain most of the time, but kept herself busy and did not sit still, and stated that she thought that if she sat still and did nothing she would feel worse. (Tr. 31-33). She testified that she could do housework and could "mop floors and stuff like that" and could make her bed, but could not do that type of work for eight hours per day. (Tr. 33). Plaintiff testified that she could not do a lot of lifting or bending, and that this was why she did not seek a job in housekeeping. (Id.) Plaintiff testified that she could not bend because sometimes her right hip felt like it would "go out," and that if she bent the wrong way she would have to stay down for "at least 10 to 15 minutes" before she could get upright. (Tr. 33-34).

Plaintiff testified that she stopped seeing Dr. Gale because she moved and his office was no longer convenient, and began seeing Dr. Smith. (Tr. 34-35). Plaintiff testified that she had medical insurance through her husband, and that the insurance company had recommended Dr. Smith. (Tr. 35). Among the complaints plaintiff reported to Dr. Smith was swelling in her right leg and hand, and that her right leg gave out on her. (Tr. 36). Plaintiff testified that, following an MRI, she was told that she had a bulging disc in her neck and back. (Id.)

Plaintiff stated that she felt pain when reaching overhead, and that Dr. Gale had recommended exercises, which were helpful. (Tr. 37). Plaintiff also testified that she had

-4-

arthritis on her spinal cord, and that she had pain in her low back and in her left hip. (Tr. 38). She stated that she could stand for one hour before experiencing pain in her legs and swelling in her left ankle, and also stated that she could sit for one hour. (Tr. 39-40). Plaintiff testified that she could drive, walk around the block, and walk through the grocery store with a cart. (Tr. 40-41). She stated that she took care of her brother, which involved cooking and giving medication. (Tr. 41-42). Plaintiff testified that she spent most of her time watching TV and going to church on Sunday. (Tr. 42). She stated that her church was a twenty minute drive from her house, and that the service lasted from 11:00 or 11:30 until 1:00 or 1:45. (Tr. 42-43). Plaintiff testified that she did not go to Sunday school because it began at 9:00 and finished at 3:00. (Tr. 43). Plaintiff testified that she did not attend for this length of time because of her brother, and because she could not sit in one place that long. (<u>Id.</u>) She stated that she felt all right after church, and returned home, fixed herself something to eat, and spent the remainder of the day around the house. (<u>Id.</u>)

    B.   <u>Medical Records</u>[2]

       Records from Forest Park Medical Clinic, Inc. ("Forest Park Clinic") indicate that plaintiff was examined by Sarwath Bhattacharya, M.D., on October 14, 2004. (Tr. 170-72). It was

_____

[2]The following summary includes medical information outside the relevant time period.

noted that plaintiff had last worked in February 2004, and that she had been terminated. (Tr. 170). Plaintiff complained of swelling and pain in her ankles, knees, hips, back, neck and hands for which she took Aleve, which relieved some of her symptoms. (Id.) Plaintiff stated that her back did not bother her very much and denied radiation. (Id.) Examination and range of motion of all joints appeared to be within normal limits except for the knee joints, which had bilateral crepitation. (Tr. 172). Dr. Bhattacharya's impression with polyarthritis with symmetrical joint involvement and stable hypothyroidism. (Id.)

Radiological records from St. John's Mercy Medical Center ("St. John's") indicate that a July 8, 2002 x-ray of plaintiff's right wrist was negative (Tr. 164); a January 9, 2004 x-ray of plaintiff's left forearm revealed minimal spur formation at the proximal aspect of the radial head, but was otherwise normal (Tr. 163); a February 11, 2002 mammogram was negative (Tr. 165-66); and a May 22, 2000 x-ray of plaintiff's lumbar spine revealed minimal degenerative change but was otherwise negative. (Tr. 167-68). Radiological records from Metro Imaging show that a March 17, 2005 x-ray of plaintiff's chest revealed bronchitis (Tr. 198); and that a November 10, 2005 x-ray of plaintiff's lumbosacral spine revealed thoracic levoscoliosis and mild degenerative spurring in the lumbar spine. (Tr. 197).

On August 18, 2006, plaintiff saw Jessica Smith, M.D., stating that she wished to transfer from another physician "because she was frustrated because she could not get lab results from some

testing she had in June." (Tr. 251). Plaintiff complained of lower back pain, wrist pain and hand pain with joint swelling, and stated that her legs gave out on her and that her muscles were weak. (Id.) Upon examination, plaintiff had some spinal pain with full flexion and extension and left lateral rotation, and full range of motion of the lumbar spine. (Id.) Plaintiff had full range of motion of her knees, with some crepitus bilaterally. (Id.) Plaintiff's wrists and elbows had full range of motion but pain with wrist dorsiflexion, and some swelling and tenderness of the joint between the first and second phalanges of her fingers. (Tr. 251). She was diagnosed with polyarthritis. (Id.) Dr. Smith prescribed Voltaren.[3] (Id.)

Bone density screening, performed on August 25, 2006 at North County Medicine & Rheumatology, yielded normal results. (Tr. 255). It was noted that there was no compelling evidence of metabolic bone disease, but that plaintiff may have low vitamin D levels. (Id.)

Records from Christian Hospital Northeast indicate that plaintiff presented on September 1, 2006 with complaints of abdominal pain, nausea, vomiting, and diarrhea after eating a large meal. (Tr. 201-05). Plaintiff later stated that the abdominal pain had moved to her chest. (Tr. 202). She denied muscle weakness, joint pain, or back pain. (Tr. 205). Ultrasound testing revealed gallstones, (Tr. 223), and she was diagnosed with

---

[3]Voltaren, or Diclofenac, is used to relieve pain, tenderness, swelling, and stiffness caused by various types of arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html

gallbladder disease. (Tr. 215). On September 11, 2006, plaintiff presented to DePaul Health Center and underwent laproscopic gallbladder removal. (Tr. 226-45).

In October of 2006, plaintiff complained of headaches, back pain and hand pain, and it appears that medication was refilled. (Id.) On October 30, 2006 plaintiff saw Dr. Smith with complaints of low back pain. (Tr. 251). Dr. Smith noted that x-rays had showed mild degenerative changes and scoliosis, but were otherwise normal. (Id.) Upon examination, plaintiff was tender in the lower thoracic and upper lumbar spine; had a negative straight-leg raise test; and had full hip range of motion with no tenderness. (Id.) Reflexes, strength and sensation were normal, and all of plaintiff's lab work was normal. (Id.) Dr. Smith recommended ibuprofen and physical therapy. (Tr. 251).

Plaintiff returned to Dr. Smith on October 10, 2007 with complaints of neck pain that radiated down her arms, and low back pain that radiated down her legs. (Tr. 273). She was tender in the cervical spine, but her symptoms could not be reproduced with cervical motion. (Id.) She was tender in her lower lumbar spine, but had a negative straight leg raise test. (Id.) Dr. Smith ordered x-rays to rule out osteoarthritis. (Id.) Dr. Smith recommended that plaintiff alternate Tylenol and Aleve. (Tr. 273). Dr. Smith then wrote that plaintiff "refused a flu shot today stating she gets them free at work." (Id.)

Cervical spine x-ray performed on October 12, 2007 revealed degenerative changes throughout, most pronounced from C4-5

through C6-7.  (Tr. 278).  X-rays of plaintiff's lumbar spine, performed this same date, revealed mild anterolisthesis of L4 upon L5, and atherosclerosis.  (Tr. 279).

An MRI of plaintiff's cervical spine, performed on October 19, 2007, revealed degenerative changes at C4-5, a midline bulge at C3-4, and a paramidline bulge at C5-6.  (Tr. 280-81).

On November 5, 2007, plaintiff saw Syed A. Abdul Khader, M.D., with complaints of pain in her neck, back, left upper extremity, and left lower extremity.  (Tr. 270).  Dr. Khader's impression was lumbar degenerative joint and cervical degenerative joint disease.  (Tr. 271).

On November 27, 2007, plaintiff saw Dr. Smith with complaints of cough, congestion, sore throat and sinus drainage.  (Tr. 274).  Dr. Smith noted that plaintiff had no other complaints.  (Id.)  Plaintiff returned to Dr. Smith on January 21, 2008 with complaints unrelated to this case.  (Id.)

Plaintiff returned to Dr. Smith on March 3, 2008 with complaints of low back pain, swelling in her left fingers, and complaints unrelated to this case.  (Tr. 275).  Upon examination, she was tender in her lower lumbar region, but strength and sensation were normal and she was able to heel and toe walk.  (Id.)  Her left hand was mildly tender with mild swelling.  (Id.)  Plaintiff returned to Dr. Smith again on April 8, 2008 with complaints unrelated to this case.  (Tr. 276).

On March 31, 2008, left hand x-ray revealed osteoarthritis of the interphalangeal joints.  (Tr. 284).

On June 24, 2008, plaintiff saw Dr. Smith with complaints of fatigue and shortness of breath, ankle swelling, and low back pain. (Tr. 289). Dr. Smith noted that plaintiff was trying to get disability for her arthritis. (Id.) Upon examination, Dr. Smith noted edema in plaintiff's extremities, and tenderness in her lower legs. (Id.) Dr. Smith's assessment was fatigue with myalgias and generalized osteoarthritis, shortness of breath upon exertion, and hypothyroidism. (Id.) An EKG was interpreted as normal. (Tr. 294).

### III.    The ALJ's Decision

The ALJ in this case determined that plaintiff met the insured status requirements through September 30, 2006, and had not engaged in substantial gainful activity during the period from her alleged onset date of July 1, 2006 through her last date insured of September 30, 2006. (Tr. 12). The ALJ determined that plaintiff had the severe impairment of arthritis, but did not have an impairment or combination of impairments of listing-level severity. (Tr. 12-13). The ALJ determined that plaintiff retained the residual functional capacity (also "RFC") to perform the full range of light work, (Tr. 13), and that nothing precluded her "from standing and walking for 6 of 8 work hours, sitting 6 of 8 work hours, lifting and carrying up to 20 pounds occasionally and 10 pounds frequently and pushing and pulling on arm and leg controls." (Tr. 16).

In his decision, the ALJ noted that he gave the most

weight to the evidence describing plaintiff's condition through her last date insured. (Tr. 14). The ALJ also acknowledged his duty to evaluate the credibility of plaintiff's subjective complaints, citing 20 C.F.R. § 1529(c)(2), and noted, inter alia, the lack of objective medical evidence to support plaintiff's complaints; plaintiff's weak earnings record; and the fact that she had been applying for benefits since 1997 which showed she was benefit-oriented; and the fact that she had been able to return to work after being denied benefits in the past, which showed that her allegations of being unable to return to work were exaggerated. (Tr. 14-16). The ALJ determined that, through plaintiff's last date insured, she was capable of performing her past relevant work as an assembly line worker. (Tr. 16).

The ALJ concluded that plaintiff had not been under a disability as defined in the Act through September 30, 2006, her last date insured. (Tr. 17).

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not

-11-

less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to

disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when

> required which is based upon a proper
> hypothetical question which sets forth
> the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

In the case at bar, plaintiff argues that it was improper for the ALJ to consider her past job of assembly line worker as past relevant work. In support, plaintiff contends that she did not perform that job at the substantial gainful activity level in the years 1998, 1999 and 2000, and that the ALJ failed to consider evidence that she worked the assembly line job through temporary agencies rather than on a permanent, full-time basis.

-14-

Plaintiff also contends that the ALJ improperly failed to obtain evidence from a vocational expert (also "VE"). In support, plaintiff argues that, because she does not have past relevant work, the ALJ should have proceeded to step five of the sequential evaluation process to determine if she was capable of performing other work. Plaintiff also argues that the ALJ could not have relied upon the Medical Vocational Guidelines (also "Grids") to meet his burden at step five because plaintiff had the non-exertional impairment of pain.

Plaintiff also contends that the ALJ failed to properly consider her RFC inasmuch as he failed to consider how each individual joint was affected by arthritis, and how the combination of multiple arthritic joints would affect RFC. Plaintiff also argues that the ALJ failed to determine how crepitation of the bilateral knees would affect her ability to stand and walk. In response, the Commissioner contends that substantial evidence supports the ALJ's decision.

A.    RFC Determination

The ALJ in this case determined that plaintiff retained the "residual functional capacity to perform the full range of light work as defined in 20 C.F.R. 404.1567(b)." (Tr. 13). The ALJ wrote that there was nothing wrong with plaintiff "to prevent her from standing and walking for 6 of 8 work hours, sitting 6 of 8 work hours, lifting and carrying up to 20 pounds occasionally and 10 pounds frequently and pushing and pulling on arm and leg

controls." (Tr. 16). The ALJ determined that plaintiff retained the RFC to perform her past relevant work of assembly line worker, noting that she lifted a maximum of 20 pounds and frequently lifted 10 pounds; did not kneel, crouch or crawl; walked, stood and sat for two and one-half hours each day, and worked eight hours per day, five days per week. (Tr. 16).

In making this determination, the ALJ exhaustively analyzed and discussed the evidence of record, including analyzing plaintiff's credibility. Although plaintiff herein does not directly challenge the ALJ's credibility determination, she does challenge the ALJ's RFC determination. Because the ALJ must first evaluate a claimant's credibility before determining her RFC, Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005), the undersigned now examines the ALJ's credibility determination.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217). Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged impairments. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). In Polaski, the Eighth Circuit addressed this

difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations or upon the lack of objective medical evidence, the ALJ may discount them if there are inconsistencies in the evidence as a whole. Id.; see also Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence). The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The ALJ is not required to discuss each Polaski factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff, 421 F.3d at 791); see also Samons v. Apfel, 497 F.3d 813, 820 (8th Cir. 2007) (citing

-17-

<u>Tucker v. Barnhart</u>, 363 F.3d 781, 783 (8th Cir. 2004) (while the <u>Polaski</u> factors should be taken into account, "we have not required the ALJ's decision to include a discussion of how every <u>Polaski</u> 'factor' relates to the claimant's credibility.") "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." <u>Juszczyk v. Astrue</u>, 542 F.3d 626, 632 (8th Cir. 2008); <u>see also</u> <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. <u>Tellez</u>, 403 F.3d at 957.

In the case at bar, the ALJ fully discussed his obligation to consider plaintiff's subjective complaints in accordance with Eighth Circuit precedent, and also cited 20 C.F.R. § 404.1529, which corresponds with the <u>Polaski</u> decision and credibility determination. (Tr. 14). The ALJ then fully analyzed the evidence of record, considered the relevant factors, and set forth numerous inconsistencies in the record detracting from plaintiff's credibility.

The ALJ exhaustively discussed the medical evidence of record, and noted that it repeatedly failed to document findings consistent with plaintiff's allegations of debilitating symptoms. For example, the ALJ noted that: radiological testing consistently yielded normal results; plaintiff's physicians repeatedly found her to be in no acute distress and noted that she walked with a normal

gait and could walk on her heels and toes; straight leg raise testing was normal; plaintiff had dexterous movements of her fingers and normal hand grip strength; and plaintiff had full range of motion throughout her musculoskeletal system, including her knees. Regarding Dr. Smith's records, the ALJ noted that Dr. Smith interpreted plaintiff's lumbar x-ray as normal with the exception of mild degenerative changes and levoscoliosis, and that testing for rheumatoid arthritis and connective tissue disease yielded normal results. The ALJ noted that Dr. Smith found that all of plaintiff's lab work was normal with the exception of high cholesterol. The ALJ noted that Dr. Smith examined plaintiff and noted normal straight leg raise testing, hip motion, reflexes, strength and sensation.

The ALJ wrote that these "essentially normal" findings were not supportive of plaintiff's "allegations of being completely disabled prior to her last date insured." (Tr. 14-15). The ALJ noted that, while plaintiff "had some crepitation in her knees, she also had full knee motion, full leg strength and no pain or tenderness on examination." (Tr. 15). The ALJ noted that plaintiff's medical records through her last date insured failed to document the presence of reduced joint motion, muscle spasm, sensory deficit and motor disruption, which are useful indicators to assist in making conclusions about the intensity and persistence of symptoms and the effect such symptoms may have on the ability to work. The ALJ wrote that the reasonable conclusion to draw from plaintiff's benign findings is that her symptoms were not as

intense, persistent and functionally limiting as she alleged.  It was proper for the ALJ to consider the fact that plaintiff failed to present medical evidence to support her allegations of pain and other symptoms precluding all work.  Cruse, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered).

The ALJ noted that plaintiff's earnings record failed to enhance her allegations, and that plaintiff earned an annual income of more than $8,200.00 only twice in her life.  A poor work history detracts from a claimant's credibility.  Pearsall, 274 F.3d at 1218 (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)); see also Ramirez v. Barnhart, 292 F.3d 576, 582 (8th Cir. 2002) (citing Black, 143 F.3d at 386) (it was proper to consider a claimant's work history and the absence of objective medical evidence to support subjective pain complaints when assessing claimant's level of pain).

The ALJ also noted that plaintiff had been applying for benefits since 1997 and had been able to return to work after being denied benefits, demonstrating that her allegations of being unable to work were exaggerated.  A claimant's apparent benefit motivation may contribute to an adverse credibility determination when, as here, other factors cast doubt upon the claimant's credibility.  Ramirez, 292 F.3d at 581 n. 4.  In the case at bar, plaintiff's apparent motivation to qualify for benefits is only one element which supports the ALJ's credibility determination, and is considered herein along with the balance of the medical records and

other evidence in the record as a whole.

The ALJ noted that, while plaintiff had alleged an onset date of July 1, 2006, there were no medical records indicating that any treating physician recommended that plaintiff cease working, or suggesting that she could not perform light work activities.  See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (adverse credibility determination supported by finding that no physician had imposed any work-related restrictions).

Furthermore, the undersigned notes that, when plaintiff presented to the Emergency Room on September 1, 2006, she specifically denied that she had muscle weakness, joint pain, or back pain.  (Tr. 205).  See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment).

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility.  An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles, 902 F.2d at 660.  Because the ALJ considered the Polaski factors and discredited plaintiff's subjective complaints for a good reason, that decision should be upheld.  Hogan, 239 F.3d at 962.

Plaintiff argues that the ALJ's RFC determination is in

error because he failed to consider how each individual joint was affected by arthritis; how the combination of multiple arthritic joints would affect RFC; how arthritis of the hands causing swelling and tenderness would affect plaintiff's RFC; and how crepitation of the bilateral knees would affect plaintiff's ability to stand and walk. Review of the decision reveals no error.

Residual functional capacity is defined as that which a claimant remains able to do despite her limitations. 20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer, 245 F.3d at 704. The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793. Although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). It is the claimant's burden to establish her RFC. See Masterson v. Barnhart, 363 F .3d 731, 737 (8th Cir. 2004).

As noted above, plaintiff does not contest the fact that her insured status expired on September 30, 2006, and that she must therefore show that she was disabled prior to the expiration of her

insured status. See 20 C.F.R. § 404.130; see also Davidson v. Astrue, 501 F.3d 987, 989 (8th Cir. 2007). As the Commissioner correctly notes, plaintiff provides little evidence from the relevant time period to support her allegations of total disability. As discussed above, on August 18, 2006 (her first medical appointment after her alleged onset date) plaintiff had full range of motion in her lumbar spine, knees, wrists and elbows, and Dr. Smith noted that plaintiff was smiling, pleasant, and in no apparent distress. (Tr. 251). On September 1, 2006, when plaintiff reported to the Emergency Room with abdominal complaints, she specifically denied that she had muscle weakness, joint pain, or back pain. (Tr. 205). In October of 2006 (immediately following the expiration of plaintiff's insured status) Dr. Smith noted that plaintiff's back x-rays showed only mild degenerative changes and were otherwise normal, and that plaintiff had full range of motion of her hips, a negative straight leg raise test, normal strength and sensation, and normal lab work. (Tr. 251). The record reflects that plaintiff sought no further medical treatment until October of 2007, at which time it was noted that she had full strength, a negative straight leg raise test, and could walk on her heels and toes. (Tr. 273).

The ALJ also noted that no physician who examined plaintiff during the relevant time period restricted plaintiff to a greater degree than the ALJ. See Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's

allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported ALJ's decision denying benefits).

The ALJ did not, as plaintiff suggests, fail to consider joint pain and swelling and how crepitation in her knees would affect her ability to stand and walk. As fully discussed above, the ALJ in this case considered plaintiff's allegations of disabling joint pain and swelling, conducted a thorough and legally sufficient credibility determination, and concluded that plaintiff's allegations that joint pain and other symptoms created functional restrictions that precluded all work were inconsistent with the evidence of record. The ALJ specifically noted that plaintiff had crepitation on movement of her knees, but nonetheless had a normal gait and full range of motion in her knees. As noted above, this finding is supported by the record. In October of 2004, plaintiff had crepitation in her knees but nonetheless walked with a normal gait, and had full strength and full range of motion in her joints; on August 18, 2006 she had full range of motion of her knees; and on September 1, 2006 she denied muscle weakness, joint pain or back pain. The ALJ was entitled to restrict his RFC assessment to only those impairments and restrictions he determined to be credible following his legally sufficient determination of plaintiff's credibility. See McGeorge v. Barnart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC

determination to only the impairments and limitations he found to be credible based on his evaluation of the entire record"). Plaintiff cites some medical evidence dated after the relevant time period to support her contentions that the ALJ's decision was in error. However, as noted above, plaintiff had the burden to demonstrate that she became disabled prior to the expiration of her insured status. See 20 C.F.R. § 404.130; see also Davidson, 501 F.3d at 989. None of the medical evidence plaintiff presented in support of her application indicates that she had disabling arthritis, or any other disabling condition, before the expiration of her insured status. While the record contains radiological reports from 2007 and 2008 indicating disc bulges and osteoarthritis, these findings are not probative of plaintiff's condition prior to the expiration of her insured status. Radiological and other testing during the relevant time period failed to reveal such findings. See Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990) (To be material, evidence must relate to the claimant's condition during the relevant time period).

The ALJ did not, as plaintiff contends, fail to consider her joint pain or swelling or crepitation; instead, he explicitly considered plaintiff's allegations in light of the record as a whole, and explicitly determined that plaintiff's alleged symptoms did not cause functional restrictions beyond those listed in the decision. Depover, 349 F.3d 567 (rejecting the argument that the ALJ overlooked functions when the record reflected that the ALJ implicitly found that plaintiff was not limited in those areas).

In her brief, plaintiff also appears to suggest that the ALJ described her RFC in only general terms, stating that she could perform the full range of light work. To the contrary, as discussed above, the ALJ in this case wrote that plaintiff had no impairments that precluded her "from standing and walking for 6 of 8 work hours, sitting 6 of 8 work hours, lifting and carrying up to 20 pounds occasionally and 10 pounds frequently and pushing and pulling on arm and leg controls." (Tr. 16). The ALJ noted that plaintiff's RFC did not preclude her performance of her past work as an assembly line worker, noting that she reported lifting a maximum of 20 pounds and frequently lifting 10; did not kneel, crouch or crawl; walked, stood and sat for two and one-half hours each day, and worked eight hours per day, five days per week. (Tr. 16). It therefore cannot be said that the ALJ expressed plaintiff's RFC in only general terms.

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. The ALJ based his decision on all of the credible, relevant evidence of record, and properly weighed all of the medical and other evidence. For the foregoing reasons, the undersigned determines that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

B.    The ALJ's Consideration of Plaintiff's Past Relevant Work
       The ALJ in this case determined that plaintiff could

return to her past relevant work as an assembly line worker as she performed it. Plaintiff alleges error, arguing that the ALJ erroneously considered her assembly line worker job as past relevant work. In support, plaintiff argues that the ALJ failed to acknowledge that plaintiff performed this work through a temporary agency and the job was therefore not permanent, full-time work. Plaintiff also argues that the ALJ failed to consider that plaintiff's average earnings in the years 1998, 1999 and 2000 fell below the levels established for substantial gainful activity. In support, plaintiff states that, in 1998, she earned a total of $2,211.27, an average monthly total of $184.27; in 1999, she earned $4,048.60, an average monthly total of $337.38; and in 2000, she earned $4,778.01, an average monthly total of $398.17. In response, the Commissioner argues that, when plaintiff's earnings are averaged only over those months that she worked, her earnings met the Regulations' earnings guidelines.

At step four of the sequential evaluation process, the ALJ considers whether the claimant has the capacity to do her "past relevant work." 20 C.F.R. § 404.1520(e). In order for a claimant's past work to be considered "relevant" for such purposes, it "must have been done within the last 15 years, lasted long enough for the person to learn to do it, and constituted 'substantial gainful activity.'" Reeder v. Apfel, 214 F.3d 984, 989 (8th Cir. 2000) (citing 20 C.F.R. § 404.1565). The Regulations define "substantial gainful activity" as "work activity that involves doing significant physical or mental activities, even if

-27-

done on a part-time basis, and work that is done for pay or profit, whether or not a profit is realized." Id. (citing 20 C.F.R. § 404.1572(a), (b)). A claimant's earnings "will ordinarily show" that she has engaged in substantial gainful activity if they average $500.00 per month from January 1990 through June 1999; and $700.00 per month from July 1999 through December 2000. 20 C.F.R. § 404.1574(b)(2)(i).[4]

The undersigned finds the Reeder decision particularly instructive. There, Ms. Reeder alleged that the ALJ erred by determining that she could return to her past relevant work as a fruit picker and packer, work that she had performed on an intermittent, seasonal basis. Reeder, 214 F.3d at 989. In support, Ms. Reeder argued that this work could not be considered substantial gainful activity because her earnings did not satisfy the earnings requirements under the Regulations. Id. In response, the Commissioner argued that Ms. Reeder's earnings satisfied the Regulations when her monthly income was averaged over the four or five months out of the year that she was seasonally employed, rather than over the entire year. Id.

In upholding the ALJ's decision to consider the job past relevant work, the Eighth Circuit wrote that it was "unnecessary to engage in this averaging debate," and that "[a]lthough earnings below the guidelines will 'ordinarily' show that an employee has not engaged in substantial gainful activity, earnings below the

---

[4]The Regulations also provide that earnings "will ordinarily show" no substantial gainful activity if they average less than $300.00 in the calendar years 1990 to 2000. 20 C.F.R. § 404.1574(b)(3).

guidelines will not conclusively show that an employee has not engaged in substantial gainful activity." Id. (citing Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993)). The Eighth Circuit noted that the Regulations stated that work may be considered "substantial" even if it was part-time; and "gainful" even if no profit is realized if it is the type of work typically done for pay or profit. Reeder, 214 F.3d at 989 (internal citations omitted).

The Reeder Court noted that plaintiff had consistently engaged in seasonal fruit-picking work; that it was the type of work typically done for pay or profit and which involved significant physical or mental activities; that Ms. Reeder had learned the job; and was capable of performing it. Id. The Eighth Circuit further noted that Ms. Reeder's low earnings were more the result of her choice to work only seasonally than an indication of her phsycial or mental inability to do the work during the entire year, and concluded that, regardless of her low earnings, Ms. Reeder's seasonal work was substantial gainful activity, and the ALJ properly considered it to be past relevant work. Id.; see also Pickner, 985 F.2d at 403 (noting that low earnings were partially due to the fact that the claimant only worked part-time, and that part-time work may be considered substantial).

In the case at bar, plaintiff focuses on the fact that her income, when averaged over the entire year, was below the earning guidelines of the Regulations. However, as in Reeder, while plaintiff's earnings (averaged over twelve months) may have been insufficient to raise the presumption of gainful activity,

this does not demand the conclusion that the work was not substantial gainful activity. "Although earnings below the guidelines will 'ordinarily' show that an employee has not engaged in substantial gainful activity, earnings below the guidelines will not conclusively show that an employee has not engaged in substantial gainful activity." Reeder, 214 F.3d at 989 (citing Pickner, 985 F.2d at 403). In addition, it is not appropriate to average plaintiff's earnings over the entire year when the record does not support the conclusion that she worked every month of the year. See Anderson v. Heckler, 726 F.2d 455, 457 (8th Cir. 1984) (a claimant's earnings should be averaged over only those months worked).

Plaintiff's assembly line work was substantial. As the Reeder Court noted, the Regulations provide that work may be considered substantial even if it is part-time. Reeder, 214 F.3d at 989 (citing 20 C.F.R. § 404.1565(a)). In her work history report, plaintiff stated that she performed this job from 1998 through 2000, and that she worked eight hours per day, five days per week. It is apparent that she was able to perform the job, and that she was able to learn the job. The fact that plaintiff may have worked this job through assignments from a temporary agency does not demand the conclusion that the work was not substantial gainful activity. Plaintiff does not present, nor is the undersigned aware of, any precedent supporting the conclusion that past work cannot be considered substantial gainful activity when it is performed through a temporary agency. The undersigned is

instructed by the Eighth Circuit's decision in <u>Reeder</u>, wherein the Court determined that the claimant's intermittent, seasonal, fruit picking and packing work was substantial gainful activity, analogizing it to part-time work, which is properly considered substantial. The undersigned draws the same analogy here.

Plaintiff's past work was also gainful. Work may be considered gainful even if no profit is realized if it is the type of work normally done for pay or profit. <u>Id.</u> (citing 20 C.F.R. § 404.1572(b)). As the ALJ in this case observed, plaintiff reported that she worked from 1998 to 2000 as an assembly line worker, and that she worked eight hours per day, five days per week, for $6.00 per hour. (Tr. 121-22). Assembly line work is normally done for pay, and involves significant physical or mental activities. The record in this case supports the conclusion that plaintiff learned the job and was capable of performing it for, as she reported, eight hours per day, five days per week. Plaintiff's low earnings appear to be more the result of her choice to obtain work through a temporary agency, rather than an indication of a physical or mental inability to perform the work throughout the year. <u>See</u> <u>Reeder</u>, 214 F.3d at 989 (recognizing that the claimant's low earnings were more a result of her choice to perform her past work on a seasonal basis than an inability to perform the work).

Plaintiff's assembly line work was substantial gainful activity, and the ALJ properly considered it to be past relevant work even though her earnings, averaged through the entire year, did not meet the earning guidelines of the Regulations, and even

though plaintiff performed the work through a temporary agency.

See Id. (concluding that the claimant's past intermittent, seasonal work as a fruit picker and packer was substantial gainful activity even though it was performed on an intermittent, seasonal basis, and even though the annual average of the claimant's earnings did not meet the earning guidelines of the Regulations).


C.    Vocational Expert Testimony

Plaintiff next contends that, because the job of assembly line worker does not meet the criteria to qualify as past relevant work, the ALJ should have continued to step five of the sequential evaluation process to determine if she was capable of performing any other work. (Docket No. 11 at page 8). Review of the decision reveals no error.

When an ALJ determines that a claimant can return to her past relevant work, the ALJ is not required to use vocational expert testimony. See Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994). As discussed above, the ALJ in this case properly determined that plaintiff could return to her past relevant work. He was therefore not required to obtain vocational expert testimony.[5]   See Id.

_____

[5]In conjunction with this argument, plaintiff contends that the ALJ would have been unable to rely upon the Medical Vocational Guidelines, or "Grids," because plaintiff had the non-exertional impairment of pain. While the undersigned has determined that the ALJ in this case properly ended the sequential evaluation process at step four, the undersigned does note that the ALJ made a finding, which is supported by the record, that plaintiff's pain and crepitation did not diminish her capacity to perform the full range of light work. See Harris, 45 F.3d at 1194, citing Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988) (the ALJ may rely upon the Guidelines if he makes a finding, supported by the record, that "the non-exertional impairment does

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that they have until August 12, 2011 to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of July, 2011.

---

not significantly diminish Plaintiff's residual functional capacity to perform the full range of activities listed in the Guidelines.")